488 So.2d 1071 (1986)
Frank Lafaye KEITH, Appellee,
v.
M.B. BEARDEN, Commercial Union Insurance Company, Ouachita Parish Police Jury, et al., Appellants.
No. 17738-CA.
Court of Appeal of Louisiana, Second Circuit.
May 7, 1986.
Writ Granted July 1, 1986.
*1073 Bruscato, Loomis & Street by C. Daniel Street, Monroe, for appellee.
Hayes, Harkey, Smith & Cascio by Charles S. Smith, Monroe, for appellant, M.B. Bearden.
Theus, Grisham, Davis & Leigh by Ronald L. Davis, Jr., Monroe, for appellants, Ouachita Parish Police Jury and Commercial Union Ins. Co.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
The defendants Ouachita Parish Police Jury (Police Jury) and M.B. Bearden (Bearden) appeal a judgment rendered against them in solido in favor of plaintiff for damages sustained when his vehicle collided with two runaway horses on a Ouachita Parish road. The lower court assessed fault at 80% to Bearden and 20% to the Police Jury.
Plaintiff Frank Lafaye Keith (Keith) appeals seeking an increase in his future lost wages award and requesting that the interest on his award against the Police Jury be made retroactive to the date of his original petition. For reasons expressed, we amend to increase the fault of the Police Jury to 35% and as amended, affirm the judgment.

FACTS
At approximately 9:00 p.m. on September 6, 1982, plaintiff and his family were returning home from a fish fry at a friend's home. The plaintiff was driving a 1976 Chevrolet station wagon west on Parker Road in Ouachita Parish. Constructed and maintained by the Police Jury, Parker Road is a two-lane blacktop road in a rural area but is an important connecter road, fairly heavily traveled, and close to the interstate. At the time of the accident, extensive foliage was growing unchecked along its shoulders, especially along the northern shoulder. As plaintiff was traveling within the posted speed limit of 45 mph, two horses suddenly appeared from behind a large willow tree. This willow tree covered the north shoulder and allegedly protruded some two to three feet into the westbound lane of the paved portion of the road. Plaintiff applied his brakes immediately when he first saw the horses but was unable to avoid hitting them.
*1074 The horses were a full grown mare and her baby colt. They were "paints," having dark coats with patches of white. They were owned by defendant Bearden and had run off when Bearden's minor son, Tracy, had attempted to move them into the Bearden barn. Bearden admitted that he did not have adequate facilities to keep the horses at the time. Bearden's home and barn are located south of Parker Road. Bearden and the local rangerider were in active pursuit of the horses when the accident occurred. Immediately following the accident, the plaintiff complained of pain in his left hip, left testicle and left leg.

PROCEDURAL HISTORY
Plaintiff initially filed suit solely against Bearden on March 9, 1983. On March 22, 1983, he amended his suit to include Bearden's liability insurer, Comco Insurance Company. Plaintiff again amended his suit on February 2, 1984 to name the Police Jury as a defendant and then again on March 8, 1984 to include the Police Jury's insurer, Commercial Union Insurance Company. After a bench trial judgment was rendered in favor of the plaintiff for $822,256.99. In written reasons for judgment the trial court found there was overhanging foliage which obscured the plaintiff's vision of the two horses. The plaintiff was found free of fault. Bearden and the Police Jury were held concurrently liable: Bearden for allowing the horses to escape and also for strict liability under LSA-C.C. articles 2317 and 2321, and the Police Jury for allowing an unreasonably dangerous condition to exist and for breaching its duty of reasonable maintenance. Fault was assessed 80% to Bearden and 20% to the Police Jury. The trial court further found the Police Jury had actual or constructive knowledge of the condition and that the offending foliage was a contributing cause of the accident. After trial Comco paid its policy limits plus interest and Commercial Union reached a settlement with plaintiff. Thus, there are only the devolutive appeals of plaintiff, Bearden and the Police Jury now before the court. The Police Jury assigns as error: 1) the trial court's failure to admit into evidence an aerial photograph of the scene of the accident; 2) the conclusion that the condition of the road shoulder was a contributing cause of the accident; 3) the finding that the highway was unreasonably dangerous; 4) the trial court's application of the burden of proof; and 5) the conclusion that the risk and harm encountered by the plaintiff fell within the scope of the protection owed by the police jury.
Bearden does not contest his liability on appeal. Rather, he contends that the trial court erred in not assessing more fault to the Police Jury. Bearden also assigns as error the trial court's conclusion that all of plaintiff's medical problems stemmed from the accident; therefore, he seeks a decrease in the damage award.
Plaintiff assigns as error the trial court's award of only $400,000 for future lost wages and earning capacity; and the trial court's award of legal interest against the Police Jury only from the date it was joined as defendant rather than from the date of the original petition.

POLICE JURY'S LIABILITY
As the trial court found, there is ample evidence that the Police Jury had notice of the condition of Parker Road.[1] Since notice was proven, there is no need to presume knowledge of the condition, under a theory of strict liability, LSA-C.C. art. 2317.
Instead the Police Jury's liability depends upon an analysis of the reasonableness of its conduct in allowing a condition to exist of which they were well aware. This is essentially a negligence determination. Kent v. Gulf States Utilities, 418 So.2d 493 (La.1982). As in any suit founded upon negligence, the plaintiff must prove the existence of a duty, a breach of that duty and damages as a result of the breach. Stevens v. State, Through Dept. of Transp., 440 So.2d 920 (La.App.2d Cir. *1075 1983), writ denied 443 So.2d 1119 (La.1984); and Everett v. La. Dept. of Transp., 424 So.2d 336 (La.1982).

DUTY
The existence of a duty on the part of the police jury is well established both statutorily and jurisprudentially. The DOTD and all political subdivisions of the state, including parish police juries, are subject to "minimum safety standards with respect to highway design, construction and maintenance. These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials." LSA-R.S. 48:35, 48:35.1. Moreover, Louisiana jurisprudence has long recognized that the DOTD owes a duty to the traveling public to reasonably repair and maintain its roadways. Wilson v. State, Through Dept. of Highways, 364 So.2d 1313 (La.App. 1st Cir. 1978), writ denied 366 So.2d 563 (La. 1979). This is particularly so if the hazard is trap-like or is unusually dangerous. Arnold v. City Parish Government, 290 So.2d 763 (La.App. 1st Cir.1974). This duty is equally applicable to parish Police Juries for roads within their jurisdiction. Pickens v. St. Tammany Police Jury, 323 So.2d 430 (La. 1975).
CAUSATIONWAS THE CONDITION OF THE ROAD SHOULDER A CONTRIBUTING CAUSE OF THE ACCIDENT?
The Police Jury contends that in order for the plaintiff to prove the willow tree was a contributing cause, he must show that the horses were traveling along the north shoulder of the road prior to appearing from behind the willow tree foliage; further, that the evidence failed to establish that the accident actually occurred at the site alleged; and that the trial court unfairly shifted the burden of proof to it to "disprove plaintiff's case."
Causation is the causal relationship between the plaintiff's harm and the defendant's alleged negligent conduct. Wattigny v. Lambert, 408 So.2d 1126 (La.App.3d Cir. 1981), writ denied 410 So.2d 760 (La.1981), cert. denied 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). In order to prove causation, the plaintiff must show that he would not have suffered his harm but for the defendant's negligence. Id. Where the negligence of more than one tortfeasor is involved, the courts have uniformly held that the negligence of each must be a "substantial factor" in bringing about the plaintiff's harm. Dixie Drive-It-Yourself v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); and Everett v. La. Dept. of Transp. etc., supra. Causation is primarily a factual determination and accordingly great weight must be given to the conclusion reached by the trial court. Cantor v. Koehring, 283 So.2d 716 (La.1973).
While the trial court in this case had some difficulty in finding that the horses came from behind the willow tree, we do not. The trial court resorted to a complex deductive analysis to find causation. We find this completely unnecessary in light of the direct, unrebutted testimony of the plaintiff and his wife that the horses came from behind the willow tree that blocked his view of the north shoulder and a portion of the west bound lane, were coming straight at him, and just prior to impact they wheeled to the south or to their right. The only possible criticism of plaintiff's testimony is that he could not say where the horses came from prior to their emergence from behind the willow branches. The lack of view can be logically explained. Plaintiff simply could not see through the foliage to the other side. As David Vinson, an associate pastor of the Garrett Road Baptist Church, testified, "the tree acted as a wall and blocked all visual observations and part of the road." R.p. 609.
Plaintiff's testimony is further corroborated by his friend, Harold Moore, who was following in his car approximately 50 yards behind the plaintiff immediately prior to the accident. He testified that the horses must have come from the north side of the road where the big willow tree was located. Otherwise, he stated, he would have seen *1076 the horses because the eastbound lane to his left was clear and he could see all the way down it. Plaintiff did not see the horses on the south side of the road nor in the eastbound lane of the road prior to the accident. Neither did his wife or Harold Moore. All testified they would have seen them had they been so situated. The trial court emphatically found that plaintiff was not negligent in that he did not fail to see what he should have seen. The conclusion is inescapable. More probably than not the horses were on the north shoulder of Parker Road immediately prior to the accident. They did not cross from the south side to the north side of the road in front of plaintiff immediately prior to the accident or at a time when he was able to see them.
Despite the Police Jury's argument that the precise location of the accident scene was not proved, we find that the record sufficiently establishes that the plaintiff's vehicle came to rest at or very near the tree. Pastor Vinson, who arrived at the scene shortly after the accident, testified that he saw the offending willow tree at the scene of the accident. Jimmie McClelland, an impartial witness and the driver of the wrecker that picked up the plaintiff's car, testified that there were tree limbs actually touching the back of plaintiff's car. Donald Moore, the officer at the scene, testified that there was some heavy foliage in the area where the accident occurred. The location of the accident scene at or very near the willow tree is also corroborated by the testimony of defendant Bearden. He testified that the plaintiff's vehicle ended up by a seven foot willow tree that grew out of the ditch and came up to at least the edge of the paved portion of the road. He stated he knew exactly where the accident scene was due to the blood stains left by the horses. Further support is provided by the plaintiff's statement to the investigating officer and the officer's subsequent accident report. Deputy Moore listed "visual obscurements" as a cause of the accident in the police report.
The only evidence presented by the Police Jury to contradict the plaintiff's version of the accident was the testimony of the rangerider, Haskell Tull, and his wife Rene, who claimed to have observed injuries on the right side of the horses. This, according to the Police Jury, proves that the horses must have been crossing the road from south to north and could not have come from behind the willow tree when struck by plaintiff. The Tulls' testimony, however, was riddled with inconsistencies, suppositions and discrepancies; even if true, it is not persuasive. The evidence as a whole preponderates in favor of the plaintiff's version of the accident. The Police Jury offered no convincing evidence to rebut the plaintiff's overwhelming proof that the horses came from behind the willow tree foliage into the path of his vehicle.
Had it not been for the offending foliage that blocked plaintiff's view, the plaintiff would have been able to see the horses in time to take evasive action and avoid the accident. Defendant Bearden and others all testified that the horses were readily visible at night. The trial court was not clearly wrong in concluding that the accident would not have occurred but for the existence of the willow tree and the other foliage that obscured the plaintiff's view of a portion of the road and shoulder. The heavy foliage was clearly a substantial factor in causing the accident.
SCOPE OF DUTYWAS THE RISK AND HARM ENCOUNTERED BY PLAINTIFF WITHIN THE SCOPE OF PROTECTION OF A DUTY OWED BY THE POLICE JURY?
There is no concrete test or rule by which the extent of a defendant's duty may be determined. Finley v. North Assurance Company of America, 476 So.2d 837 (La.App.2d Cir.1985). Instead, scope of duty questions must be resolved by inquiring into the purpose of the rule and whether the particular plaintiff is among those persons the rule was designed or intended to protect. Id. An examination of related cases is helpful in this determination.
*1077 In Stewart v. Lewis, 292 So.2d 303 (La. App. 1st Cir.1974), the duty was extended to include the risk that vegetation growing at a highway intersection could obstruct the vision of motorists and thus contribute to an accident. In Stewart, the plaintiff's vehicle was hit when she pulled out of an intersection to see around some bushes and other vegetation that were blocking her view. Of particular significance to the instant case is the court's reliance in Stewart on the adverse effect the vegetation had on the motorist's visibility or "sight distance." The vegetation in Stewart, like the vegetation here, impeded a motorist's ability to see what should have been seen. The duty to keep roads and shoulders reasonably safe has even been held to include the risk that a tree situated on private property that leans over a highway right-of-way might fall and cause an accident. Wilson v. State, Through Department of Highways, supra. Finally, the duty has been interpreted to include the obligation to warn motorists of roaming livestock. State Farm Mutual Auto Ins. Co. v. Slaydon, 376 So.2d 97 (La.1979).
Here, the risk encountered by Mr. Keith was that vegetation growing on the shoulder and extending into the paved section of the road would obstruct his view of that portion of the road and shoulders to such an extent that he would be unable to see an animal, pedestrian or stalled vehicle until it was too late to take evasive action. Dr. William Hadley, a civil engineer familiar with highway safety standards, testified that one of the primary functions of a road shoulder is to provide "sight distance." This term was explained by Mr. Hadley to mean that a road shoulder should provide a sufficient line of sight far enough ahead to allow a motorist to take evasive action. If the shoulder is cluttered with dense foliage, as was the case here, then sight distance is adversely affected. Even the police jury's expert, David Dumas, admitted on cross-examination that if foliage were allowed to extend two to three feet into the roadway it would create a visual obstruction to sight distance. Therefore, the risk encountered is exactly the type of danger to be expected from failure to maintain the road shoulder and is exactly the type of harm that the duty to maintain the shoulder seeks to prevent. Thus, we conclude that the Police Jury's duty to keep roads and shoulders reasonably maintained encompasses the risk that befell the plaintiff.
BREACH OF DUTYWAS THE CONDITION OF THE ROAD SHOULDER UNREASONABLY DANGEROUS WHERE THE ACCIDENT OCCURRED?
The police jury raises the issue of whether the condition of the road shoulder was unreasonably dangerous. Strictly speaking, "unreasonably dangerous" is a strict liability concept. However, as noted in Lang v. Prince, 447 So.2d 1112 (La.App. 1st Cir.1984), writ denied 450 So.2d 1309, 1311 (La.1984), and Kent v. Gulf States, supra, the analysis of unreasonable danger under strict liability is essentially the same as the analysis of reasonableness under negligence, except for the imputation of knowledge. The policy considerations are the same in both analyses. Kent, supra. Given the trial court's specific finding of knowledge we will treat appellant's argument as a breach of duty question.
As in any negligence case, the claimant must prove that something about the thing (or condition) created an unreasonable risk of injury that resulted in the damage and that the owner who knew of the risk failed to render the thing (or condition) safe or to take adequate steps to prevent the damage caused by the thing. Kent, supra at 497.
The Police Jury admits in brief that Parker Road needed maintenance and that vegetation grew up to and even over the road at points, but contends that the utility of roads like Parker Road, even if not properly maintained, far outweighed the risk of harm that might be occasioned by the lack of proper maintenance. The trial court rejected this contention and we agree. The situation in Entrevia v. Hood, 427 So.2d 1146 (La.1983), cited by the police jury, did not pose as great a risk of harm as in the *1078 instant case. In Entrevia, the plaintiff, a trespasser, was injured when the deteriorated steps of an old abandoned farmhouse collapsed under him. The farmhouse was located on a remote rural tract that was surrounded by a fence and posted "no trespassing." The Supreme Court affirmed the trial court's finding that the steps did not constitute an unreasonable hazard, reasoning that under the circumstances the magnitude of the risk and the gravity of the harm were small. Entrevia, supra at 1150. In the instant case, while Parker Road is in a "semi-rural" area, it is close to the interstate and is well-traveled.[2] It is intended for the use of the motoring public. Moreover, the "semi-rural" area has a higher population of domestic animals and it is reasonable to assume that the animals will get loose at times. Considering the condition of the road in relation to the extent of use, the type of use and the location, there was a high likelihood of harm. Experts for both the plaintiff and the Police Jury agree that if the road shoulder was in the condition described by plaintiff and essentially admitted by the police jury in brief, then it would indeed constitute a hazard or risk of injury. We further note that the evidence and policy considerations we discussed in connection with the scope of the police jury's duty are equally relevant here.
The Police Jury also contends that the plaintiff's failure to keep a proper outlook was the cause of the accident. However, the trial court found the plaintiff free of fault. We agree there is absolutely no evidence in the record to show the plaintiff was negligent.
Based upon our review of the record we conclude the trial court was not manifestly erroneous in its determination that the condition of the north shoulder of Parker Road posed an unreasonable risk of harm to motorists and that the Police Jury breached its duty to the public by its failure to properly maintain the road.
The remainder of the cases cited by the police jury in this regard are all factually distinguishable from the instant case. See, Duffy v. State of Louisiana, Department of Transportation and Development, 415 So.2d 375 (La.App. 1st Cir.1982), writ denied 420 So.2d 448 (La.1982); McLeod v. Parish of East Baton Rouge, 414 So.2d 1341 (La.App. 1st Cir.1982), writ denied 420 So.2d 455 (La.1982); Smith v. Louisiana Department of Transportation, 430 So.2d 335 (La.App. 3d Cir.1983), writ denied 434 So.2d 1095 (La.1983); Hessifer v. Southern Equipment, Inc., 416 So.2d 368; Allison v. City of Baton Rouge, et al, 439 So.2d 570 (La.App. 1st Cir.1983), writ denied 443 So.2d 587 (La.1983); and Koppie v. Commercial Union Insurance Co., 478 So.2d 179 (La.App. 3d Cir.1985), writ denied 479 So.2d 922 (La.1985). In all these cases there were only minor imperfections or else only minor risks of harm. Therefore, we do not find any of these cases to be controlling in the instant situation.
In its final argument on this issue, the police jury contends that they should not be held liable due to their limited budget. We reject this argument. The Police Jury has a duty to properly maintain roads within their jurisdiction. Furthermore, LSA-R.S. 48:589 mandates that the Police Jury annually budget the amounts necessary to carry out this duty.

ALLOCATION OF FAULT
Appellant Bearden raises the issue of whether the trial court correctly allocated fault. This court recently set forth the relevant considerations for reviewing allocations of fault in Finley v. North Assurance Company of America, supra. Quoting the Supreme Court's language in Watson v. State Farm Fire & Casualty Co., 469 So.2d 967 (La.1985), we noted that it is proper to consider "both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." Further *1079 considerations noted were "1) whether the conduct resulted from inadvertence or involved an awareness of the danger; 2) how great a risk was created by the conduct; 3) the significance of what was sought by the conduct; 4) the capacities of the actor, whether superior or inferior, and 5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought." 469 So.2d at 974.
The record supports a determination that the Police Jury's negligent conduct clearly included an awareness of the risk. Charles McManus, the Police Jury supervisor in charge of road maintenance, testified that he was aware of how fast the willow trees grew in the area of the accident on Parker Road. In fact, he testified by deposition that he had stopped and cut a protruding willow tree along Parker Road himself in 1982. Further, defendant Bearden testified that in the eight years he lived on Parker Road, the Police Jury had never cut back the willow trees. Other witnesses corroborated this testimony. Thus, the Police Jury permitted the dangerous road condition to exist unchecked for years. By comparison, Bearden's conduct in allowing the horses to escape was inadvertent. It is also significant that when the horses escaped at the hands of Bearden's minor son, Bearden immediately set out to recover them.
As for the risk created, we find that the conduct of Bearden and the Police Jury both posed a serious risk of harm. Either act could have caused a serious injury. However, we find that the risk posed by the dense foliage was necessarily greater than that which the trial court found. For every day the police jury allowed the foliage to grow and obscure the sight distance along the road, the probability of harm increased. The risk posed by the horses' escape on the other hand, was only temporary. Moreover, the foliage posed additional risks beyond the factual confines of this case. The foliage could just as easily have blocked a motorist's view of a deserted or disabled vehicle or a person who happened to be walking or jogging down the road. There is also evidence in the record to indicate that the foliage was so dense in places that it actually prevented the use of the shoulder for emergency purposes. In the instant case, it took an equal combination of the defendants' conduct to cause the plaintiff's harm.
Based on the foregoing considerations we find the trial court was manifestly erroneous in its allocation of fault. However, as in any review of a damage award we are limited to lowering the award against any defendant to the highest point we would have affirmed on appeal. Finley, supra, and Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Accordingly, we fix the negligence of the defendant Bearden at the highest percentage we would have affirmed, 65%. The Police Jury's negligence is fixed at 35%.

CAUSAL RELATION BETWEEN THE ACCIDENT OF SEPTEMBER 6, 1982 AND PLAINTIFF'S INJURIES
Defendant Bearden assigns as error the trial court's finding that all of the plaintiff's medical problems are related to the accident. He points out that the plaintiff continued to work as a UPS routeman for some time after the accident; that the plaintiff's neck pain did not begin until four months after the accident; that plaintiff did not complain of headaches until one year after the accident; and that plaintiff was not specifically diagnosed as having a disc problem until a year after the accident. Due to these time delays and because the doctors who first examined the plaintiff found no serious injuries, defendant Bearden suggests that only 50% of plaintiff's medical problems should be attributed to the accident and that the other 50% should be attributed to his subsequent work. The trial court rejected this argument and attributed all the plaintiff's injuries to the accident.
The burden of proving both the existence of injuries and the causal relationship between them and the accident rests with the plaintiff. Young v. Department of Hospitals, 365 So.2d 848 (La.App. 3d Cir.1979), *1080 writ denied 368 So.2d 137 (La.1979). Such proof must be shown by a reasonable preponderance of the evidence. Id. The factual findings of the trial court in this regard are entitled to great weight and should not be disturbed on appeal absent a manifest abuse of discretion. Id., and Reck v. Stevens, 373 So.2d 498 (La.1979). While expert medical testimony is to be considered, the court must make the ultimate determination of whether the plaintiff has proved causation of his injury, not the medical experts. Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982).
Immediately after the accident, the plaintiff testified that he began to feel pain in his left leg, left hip and left testicle. Several witnesses corroborated that plaintiff was limping at the scene of the accident. The plaintiff continued to experience pain that night. The day after the accident he attempted to go to work but was unable to operate the clutch on his UPS truck due to pain in his left leg. He had to call in for a relief man. Two days after the accident he saw Dr. John Norris, a general practitioner, who noted the general complaints of pain but found no serious injury. Plaintiff missed three days of work and was referred to Dr. Norris's associate, Dr. Woods. Dr. Woods gave plaintiff a steroid shot in the left hip. Plaintiff continued to work with only intermittent absences but testified that his pain became progressively worse and that he was able to work only with the aid of pain pills and muscle relaxants.
Because of his continued pain, the plaintiff saw a number of doctors within the next several months. He saw Dr. Rambach in Shreveport, in January 1983. His findings corresponded with Dr. Norris', but he also noted some degenerative changes at L-3 through L-5 and thought that plaintiff's continued work routine could have aggravated the problem. In June he was examined by Dr. Belchic, whose findings were similar. In July, plaintiff saw Dr. Greer, who initially prescribed a conservative treatment plan. When this showed little progress, he had plaintiff undergo a CT scan and myelogram. They revealed a bulging disc and nerve impingement at L-5, S-1. Dr. Greer performed a partial hemilaminectomy and foraminotomy in January 1984, removing a ruptured disc at L-4 and decompressing a nerve root at L-5. He also found at L-5 adhesive bands, indicative of an "older injury."
Since plaintiff's condition still did not improve, Dr. Greer performed additional operations in February and June. By then, plaintiff was also complaining of headaches and neckaches. Another EMG and myelogram revealed a partial block at C-6 and C-7. Thus Dr. Greer performed yet another surgery, a decompressive laminectomy from C-4 to C-7.
As a result of the injuries sustained and the surgeries which sought to relieve plaintiff's pain, the plaintiff now suffers numbness in his right fingers and left foot. He also continues to experience some pain in the left hip and shoulder blades. At the time of his trial deposition, Dr. Greer gave plaintiff a 55 to 70% range of permanent disability contingent upon the success of the latest surgery.
As for the cause of plaintiff's disc problems, Dr. Greer specifically testified that there was a "direct cause and effect relationship" between the accident and the plaintiff's back problems. On cross-examination Dr. Greer did admit that plaintiff's work may have contributed to his injuries. However, Dr. Greer then qualified this statement by indicating that he felt that the accident was the "initial cause" of the injuries and that the plaintiff's work could have aggravated the symptoms. This conclusion is reasonable in view of the fact that plaintiff had worked for UPS for several years, had been very active in sports and recreational activities and only began experiencing pain after the accident.
Even Drs. Norris and Rambach, who initially found no serious injury, agreed that disc injuries such as those suffered by plaintiff are hard to diagnose as the outward symptoms often come and go. Thus, it is not unusual for a substantial amount of time to pass between the cause and *1081 discovery of disc injuries. The elusiveness of disc injuries is also well recognized in case law.[3]
Defendant Bearden contends that, based upon the foregoing facts, the evidence is insufficient to prove that all of plaintiff's injuries are related to the accident. We disagree. In Martin, supra, the plaintiff was injured on the job and immediately began experiencing back pain. The first two doctors to examine him found no disc injury. However, the third doctor who examined plaintiff performed a myelogram and found a disc injury. An operation was conducted and a herniated disc removed. The Louisiana Supreme Court, recognizing the high accuracy rate of myelograms, held that the plaintiff sufficiently proved causation. In finding a causal connection, the court noted that the plaintiff had been in good physical health prior to the accident and that the plaintiff's back pain manifested itself continuously thereafter. We find these facts to be very similar to the instant case.
We recognize that a defendant is only liable for the direct and proximate results of his wrongful act and that he is always entitled to show that the injuries complained of are not solely attributable to his wrongful act. Waggoner v. Marquette Casualty Co., 181 So.2d 475 (La.App. 2d Cir.1965). However, in order to make this showing the defendant must prove the existence of another distinct, intervening cause. Id.; and Eubanks, supra. In Waggoner, this court limited a plaintiff's recovery to damages incurred before returning to work. However, in Waggoner, unlike the instant case, there was actual proof of a subsequent injury on the job. Waggoner, supra at 478, 479. While defendant Bearden alludes to the fact that plaintiff's work may have contributed to his injuries, there is no concrete evidence of this in the record. There must be some independent or distinct proof of a subsequent injury in order for us to find an intervening cause sufficient to break the chain of causation. We cannot simply supply the necessary proof of subsequent injury from the nature of plaintiff's work and from Dr. Greer's testimony. The trial court obviously concluded that there was no proof of any job-related injury to break the otherwise strong chain of causation.
As to the plaintiff's cervical injuries, Dr. Greer testified that the accident likely accentuated or aggravated a pre-existing arthritic condition. It is well recognized that a tortfeasor takes his victim as he finds him and is liable for aggravation of pre-existing conditions. Again, the record reveals that prior to the accident plaintiff did not suffer from back problems. Dupree v. Louisiana Transit Management, 441 So.2d 436 (La.App. 2d Cir.1983), writ denied 445 So.2d 1233 (La.1984); and Perniciaro v. Brinch, 384 So.2d 392 (La.1980).
Based upon our review of the record, we do not find the trial court was manifestly wrong in its conclusion that all the injuries causing plaintiff's disability were related to the accident.

LOST FUTURE EARNINGS AWARD
In his appeal, plaintiff assigns as error the trial court's award for future lost wages and lost earning capacity. Plaintiff argues the trial court erred in accepting the figure advanced by defendant's economist, Dr. Jerry Hood, claiming Dr. Hood used an unconscionable discount rate.
Awards for future lost wages and lost earning capacity are inherently speculative and cannot be predicted with absolute certainty. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir. 1984). Accordingly, the trial court must have great discretion in fixing such awards. Holmes v. Texaco, 422 So.2d 1302 (La.App. 5th Cir.1982). As we noted in Green v. Farmers Insurance Company, 412 So.2d 1136 (La.App. 2d Cir.1982), there is no "right" formula for establishing lost wages and lost earning capacity and absent *1082 an abuse of discretion a reviewing court may not substitute its judgment for that of the trial court merely because the reviewing court believes that a different award would have been more appropriate.
Defense economist Dr. Jerry Hood, an associate professor of finance at Nicholls State University, fixed plaintiff's future lost wages and lost earning capacity at $360,819. He took the past five years of plaintiff's salary and developed a trend line for projecting future wages and earning capacity. He then projected future wages and earning capacity over a work life expectancy of 18.6 years. Using U.S. Security bonds as his rate, he then discounted the projected future earnings to a present value of $367,062. He then added in the value of plaintiff's hospitalization ($40,720) for a total of $407,782. Adjusting for future earnings at minimum wage he arrived at the grand total loss of $360,819.
Plaintiff's economist, Dr. Bettinger, on the other hand, used plaintiff's earning capacity at the time of the accident, which he calculated to be $32,867. He then projected this figure over an estimated worklife of 18.7 years. His projection rate differed in that he included an average annual pay increase of 7½%, which consisted of a 4½% rate of inflation and a 3% productivity increase. Bettinger's applied discount rate of 6½% differed from Hood's. Dr. Bettinger, like Dr. Hood, subtracted for future minimum wage earnings and concluded that the plaintiff's total loss was $727,627. Dr. Bettinger's calculation also differed from Hood's in that he added in a 32.2% increase over base salary to account for plaintiff's "fringe benefits." Implicit in Dr. Bettinger's calculation is a continuing inflationary spiral that would have plaintiff earning slightly over $117,000 per year by the eighteenth year.
The trial court, in an extensive review of the experts' testimony, specifically noted Dr. Hood's objections to Dr. Bettinger's calculations. In particular, the trial court was persuaded by Dr. Hood's objections to the inclusion of all holiday and vacation periods, the calculation of fringe benefits and the continuing annual increase of plaintiff's wages.
Recognizing the fact that inflationary trends and interest rates cannot be predicted with absolute certainty, the trial court fixed the plaintiff's future lost wages and lost earning capacity at $400,000. The trial court's reasons for judgment reveal that the trial judge evaluated both experts' testimony and attempted to reach a reasonable conclusion. We note the trial court's award is almost $40,000 higher than the figure proposed by the defense expert, Dr. Hood. Apparently, the trial court took into consideration the fact that Dr. Hood failed to consider all of the plaintiff's fringe benefits. While the trial court's award of $400,000 appears to be in the low range, we do not find that it constitutes a manifest abuse of the trial court's broad discretion.

LEGAL INTEREST
Plaintiff also assigns as error the trial court's denial of legal interest against the police jury from the date of plaintiff's original demand. The plaintiff filed his original petition on March 9, 1983, but did not add the Police Jury as defendant until February 2, 1984, almost a full year later. The trial court assessed legal interest against the Police Jury and its insurer only from the dates they were sued. Plaintiff attempts to analogize this situation to the rule of prescription under LSA-C.C. art. 1799, whereby a suit against one solidary obligor interrupts prescription against all. Plaintiff also cites LSA-C.C.P. art. 1153 for the proposition that an amended petition bringing in additional parties after prescription has run relates the amendment back to the date of the original filing.
This same issue was faced by our brethren on the Fourth Circuit Court of Appeal in Cook v. Deshautreaux and Klein Pediatric Clinic, 315 So.2d 405 (La.App. 4th Cir.1975). In Cook, the plaintiff originally sued only the lessees of a building by their actual name. The owner of the building and the insurance company involved were unknown and originally only named fictitiously. After discovery, plaintiff learned *1083 the names of the owner and insurance company and amended his suit to supply their true names. Faced with the same argument as plaintiff presents in the instant case, the court interpreted LSA-R.S. 13:4203 to impose interest against a party cast in judgment, as a general rule, only from the date that judicial demand was filed against that party. Finding that the filing of the original suit did not present a "judicial demand" against the later named defendants the court granted legal interest on the award only from the date the defendants were actually named in the suit. Finding no reason to disagree with Cook, supra, we limit legal interest on the award, as it pertains to the police jury, from the date they were actually named in the suit.

PROFFER OF AERIAL PHOTOGRAPH
The police jury also assigns as error the trial court's refusal to allow an aerial photograph of the accident scene into evidence. Apparently, the police jury obtained a photo during trial and attempted to introduce it into the record. Our review of the record fails to reveal where the Police Jury ever sought to introduce the photo or where the trial court ever ruled on its admissibility. The parties' briefs are of no assistance in this regard as they fail to indicate where in this voluminous record such an offering and ruling appears. Nevertheless, both the plaintiff and the Police Jury treat the issue as if the photo had actually been offered and ruled upon. In brief, plaintiff admits that in the middle of trial the Police Jury produced the aerial photograph. Plaintiff then points out that the photo had not been listed in the pre-trial statement which required counsel for all sides to give opposing counsel five days' notice prior to trial of any additional exhibits or witnesses. Plaintiff contends that he objected to the photo on this basis and the trial court sustained the objection. The Police Jury contends in brief that it did not learn of the photo until trial. Citing Gilcrease v. Gilcrease, 438 So.2d 658 (La.App. 2d Cir.1983), writ denied 442 So.2d 461 (La. 1983), it argues the trial court should have modified the pre-trial statement and allowed the photo in order to prevent "substantial injustice." The pre-trial order controls the subsequent course of action unless it is modified at trial to prevent manifest injustice. Sibley v. Menard, 398 So.2d 590 (La.App. 1st Cir.1980), writ denied 400 So.2d 211 (1981). In refusing to modify the pre-trial order the trial judge has much discretion. Barbay v. Aetna Cas. & Surety Co., 454 So.2d 181 (La.App. 1st Cir. 1984), writ denied 457 So.2d 1181 (La. 1984).
An orderly disposition of the case and the avoidance of surprise are sufficient reasons for not allowing a change from the pre-trial order. Avondale Shipyards, Inc. v. Larose Shipyard, Inc., 289 So.2d 192 (La.App. 1st Cir.1973).
Without a transcript of the circumstances surrounding the offering of the photo and the court's ruling thereon, we are unable to hold that the trial judge abused his much discretion in refusing to admit the exhibit. However, assuming error without so holding, we find no reason to reverse. In order to mandate reversal, the Police Jury must prove prejudice or "substantial injustice" resulted from the trial court's refusal to admit the photo. It has failed to do so. We have examined the exhibit and the Police Jury admits the photo was taken from a height of 6,000 feet and that it is of poor quality. The photo would have added little, if anything, towards acquainting the court with an overview of the accident scene since another aerial photo and numerous sketches of the scene were already admitted into evidence. The distance factor and admittedly poor quality make the photo unreliable to show the extent of the foliage on the road and shoulder. The proffered exhibit was thus cumulative and was not essential to prevent "manifest injustice." From the record before us, we cannot say the lower court erred in refusing to admit the aerial photograph. Naylor v. La. Dept. of Public Highways, 423 So.2d 674 (La.App. 1st Cir. 1982), writ denied 429 So.2d 127 (La.1983).
Accordingly, that portion of the trial court's judgment which allocates fault between *1084 the defendants is amended to read as follows:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, as between the defendants, the fault of M.B. Bearden is fixed at 65% and the fault of defendant Ouachita Parish Police Jury is fixed at 35%.
The trial court's judgment is affirmed in all other respects.
Costs of appeal are assessed one-half to appellant Bearden and one-half to appellant Keith. The Police Jury, as a state governmental body, cannot be assessed with any court costs, except the stenographer's costs for taking testimony. LSA-R.S. 13:4521.
AMENDED AND AFFIRMED.
NOTES
[1] The Police Jury even admits this. Police Jury's brief, p. 26.
[2] Parker Road is only .3 miles from I-20, a major interstate, handles approximately 685 cars a day, serves as a connector road between two more well traveled roads, Garrett Road and Moore Road, and is also used by pedestrians who walk or jog down the road.
[3] See, Martin v. H.B. Zachry Company, supra, where a two-year delay between injury and discovery did not defeat the causal connection. See also, Eubanks v. Brasseal, 318 So.2d 79 (La.App. 2d Cir.1975), where causation was upheld under similar facts.